IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MITCH'S AUTO SERVICE CENTER, | : | CIVIL ACTION |
| Inc., et al., | : | NO. 10-3413 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| STATE AUTOMOBILE MUTUAL | : | |
| INSURANCE Co., | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              OCTOBER 24, 2011

## I.    INTRODUCTION

Mitch's Auto Service Center, Inc., and Mitchell Hartka
("Plaintiffs"), filed this breach of contract action against
State Automobile Mutual Insurance Co. ("Defendant") in the Court
of Common Pleas of Philadelphia County for failure to pay a claim
under an insurance policy.  The Complaint asserts four causes of
action: Breach of Contract (Count I); Detrimental Reliance/
Misrepresentation (Count II); Unfair Insurance Practices pursuant
to 42 Pa. Cons. Stat. § 8371 (Count III); and Violation of
Pennsylvania's Unfair Trade Practices Act, 73 Pa. Cons. Stat. §

201-2(4) (Count IV).[1]  On March 29, 2011, Defendant moved for
summary judgment on Counts I and III, the only remaining counts.
Plaintiffs opposed and responded appropriately; the motion is now
ripe for disposition.

Under Count I, Defendant's alleged breach of contract,
first the Court determines whether the Policy and applicable
provisions are clear and unambiguous.  Next, the Court addresses
Defendant's argument that it did not breach the contract by
denying Plaintiffs' insurance claim because the Policy requires
documentation as a predicate to claim collection.  As to Count
III, Defendant's alleged bad faith, the Court considers
Plaintiffs' assertion that Defendant engaged in bad faith in its
drafting of the Policy.  Next, the Court considers whether
Defendant's conduct during this insurance claim rises to the
level of bad faith.

As discussed below, whether documentation is a
predicate to payment under the Policy is ambiguous from the
Policy language, and genuine issues of fact remain in regards to

---

[1]     Following receipt of Plaintiffs' Complaint, Defendant
removed the case to this Court alleging jurisdiction pursuant to
diversity of citizenship.  See 28 U.S.C. § 1332(a)(1).
Plaintiffs moved to remand the case to state court on July 13,
2010, and Defendant filed a motion to dismiss on July 14, 2010.
On October 4, 2010, the Court denied Plaintiffs' motion to remand
and granted Defendant's motion to dismiss Plaintiffs' claims for
punitive damages and attorney's fees in Count I; Count II in its
entirety; Count IV in its entirety; and Plaintiffs' concluding
claim for damages.  ECF No. 15.  At present, the remaining claims
are Counts I and III.

Plaintiffs' fulfillment of payment conditions.  Therefore, the
Court will deny Defendant's summary judgment motion as to Count
I.  With respect to bad faith, the Court finds that: (1)
Pennsylvania law does not recognize a cause of action for bad
faith drafting of an insurance policy; and (2) Defendant's
conduct was not in bad faith.   Accordingly, the Court will grant
Defendant's summary judgment motion as to Count III.  Finally,
the Court, sua sponte, considers its jurisdiction to continue to
adjudicate Plaintiffs' claims based upon its disposition of
Defendant's motion and decides to proceed to trial with the
remaining issues.

## II.   BACKGROUND[2]

This suit relates to a claim submitted by Plaintiffs
under a commercial insurance policy issued by Defendant.  The
parties entered into a preferred business policy of insurance
("Policy") for a period covering January 1, 2008 to January 1,
2009.  Pls.' Compl. ¶ 4.  The Policy included comprehensive
business coverage to Plaintiffs, including coverage in the event
of loss caused by fire.  Id.  On May 1, 2008, a motor vehicle at
Plaintiffs' business--an automotive repair garage--combusted
resulting in a fire that caused much damage.  Id. at ¶¶ 1, 5.

---

[2]      In accordance with the applicable standard of review,
see infra, the facts set forth in this section are viewed in the
light most favorable to Plaintiffs.

3

Plaintiffs submitted claims under the Policy and Defendant paid all claims except $64,118.86. Id. at ¶ 7. Specifically, Plaintiffs filed three Sworn Proof of Loss statements and the total remaining unpaid from such statements was the amount of depreciation[3] deducted from the value of buildings. See Def.'s Br. in Supp. of Mot. for Summ. J. Exs. B-D. Defendant, despite repeated demands, refused to pay the $64,118.86 justifying its refusal on the basis of Policy provisions that allegedly require the insured to first effectuate repairs and submit the receipts for actual repair costs. See Pls.' Compl. ¶ 8.

    A.    The Policy Provisions at Issue

          One of the provisions alleged applicable to this case by Plaintiffs is provision E(4)(a), entitled Loss Payment, which states the following:

> In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>
> (1)   Pay the value of lost or damaged property;
> (2)   Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;
> (3)   Take all or any part of the property at an agreed or appraised value; or
> (4)   Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below

---

[3]    Depreciation is the term used for amounts that are deducted from the true replacement value, as new, of a building for wear and tear. It is also commonly referred to in the insurance industry as hold back funds. See Pagano Dep. 11:19-12:1, Feb. 17, 2011.

4

> We will determine the value of lost or damaged property, or the cost of its repair or replacement in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

Pls.' Compl. Ex. A, at 13.  Moreover, this provision refers to provision E(7), entitled Valuation.  The Valuation provision provides how Defendant calculates the value of Covered Property and states the following:

> We will determine the value of Covered Property in the event of loss or damage as follows:
>
> a.   At actual cash value[4] as of the time of loss or damage, except as provided in b., c., d., and e. below.
> b.   If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building or replacement.

---

[4]   The policy defines Actual Cash Value as follows:

[T]he amount it would cost to repair or replace Covered Property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence.  Actual cash value applies to valuation of Covered Property regardless of whether that property has sustained partial or total loss or damage.  The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

Def.'s Br. in Supp. of Mot. for Summ. J. Ex. A.2, at 5.

5

<u>Id.</u> at 14.  The final provision is G(3), under the Optional Coverage heading, entitled Replacement Cost.  In pertinent part, this provision provides the following:

> a.  Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.
>
> * * *
>
> c.  You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis.  In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.
>
> * * *
>
> e.  We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:
>
> (1)  The Limit of Insurance applicable to the lost or damaged property;
> (2)  The cost to replace the lost or damaged property with other property:
> (a)  Of comparable material and quality; and
> (b)  Used for the same purpose; or
> (3)  The amount actually spent that is necessary to repair or replace the lost or damaged property.

Pls.' Compl. Ex. A, at 16-17.

> Also pertinent for this case is a general provision allowing Defendant to inspect Plaintiffs' books and records, it states the following: "We may examine and audit your books and

6

records as they relate to this policy at any time during the
policy period and up to three years afterward." Id. at 2.  In
addition, the Policy contains a provision barring "a legal
action" against Defendant unless "[t]here has been full
compliance with all of the terms of this Coverage Part . . . ."
Id. at 3.


B.   Plaintiffs' Claim and Subsequent Dispute

After Plaintiffs' loss, they enlisted the help of
public adjuster George Pagano to facilitate the claims process.
With Mr. Pagano's help, Plaintiffs filed at least three Sworn
Proof of Loss statements and received payments thereto.  That was
not the end of the matter, as Plaintiffs contend that they were
still owed depreciation withheld from their initial claims.  Each
Sworn Proof of Loss statement is signed by Plaintiffs, notarized,
and provides that Plaintiffs are receiving payments on an Actual
Cash Value basis and may recover depreciation funds by filing a
supplemental claim within 180 days in accordance with the
Replacement Cost provision of the Policy.  Def.'s Br. in Supp. of
Mot. Summ. J. Exs. B-D.  According to Defendant, while it admits
that Plaintiffs' claim may be covered by the Policy, it has so
far declined to pay the claim because Plaintiffs have not
provided documentation proving they have actually spent more

7

repairing the damaged property than Plaintiffs already received from Defendant.

In regards to such documentation, Plaintiffs admit that little, if any, documentation exists, because much of the repair work on Plaintiffs' premises was paid in kind or performed by Plaintiff-Hartka himself.  <u>See</u> Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. 5.  Nonetheless, Plaintiffs contend that such monies are owed to them based upon the above policy provisions and a representation made by Defendant's independent adjuster Christopher Wixted that the depreciation funds were to be released once Plaintiffs completed 80 percent of the repairs.  <u>Id.</u> at 9.  Despite this alleged oral agreement, Plaintiffs and Defendant corresponded several times discussing release of the depreciation funds.  <u>See</u> Def.'s Br. in Supp. Mot. for Summ. J. Exs. F-L.  In sum, these correspondences state Defendant's position that Plaintiffs must actually spend money above the Actual Cash Value Plaintiffs already received and provide documentation supporting such expenditures to recover any depreciation funds.  Plaintiffs disagreed with Defendant's position and filed suit to recover these depreciation funds.

## III. DISCUSSION

A. <u>Legal Standard</u>

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact."  <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 581 (3d Cir. 2009) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986)).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party.  "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party."  <u>Pignataro v. Port Auth. of N.Y. & N.J.</u>, 593 F.3d 265, 268 (3d Cir. 2010) (citing <u>Reliance Ins. Co. v. Moessner</u>, 121 F.3d 895, 900 (3d Cir. 1997)).  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth

9

specific facts showing that there is a genuine issue for trial."
<u>Anderson</u>, 477 U.S. at 250.


   B.   Application

      Defendant moves for summary judgment on each of
Plaintiffs' claims: Count I, breach of contract, and Count III,
bad faith.  Taking each in turn, the Court will deny Defendant's
motion for Count I and grant it for Count III.[5]


      1.   <u>Plaintiffs' Contract Claim</u>

      Defendant moves for summary judgment on Count I.  In
that count, Plaintiffs aver Defendant is in breach of contract by
not paying the outstanding claim of $64,118.86.

      "The interpretation of an insurance policy is a
question of law . . . ."  <u>Kvaerner Metals Div. of Kvaerner U.S.,</u>
<u>Inc. v. Commercial Union Ins. Co.</u>, 908 A.2d 888, 897 (Pa. 2006)
(citing <u>401 Fourth St. v. Investors Ins. Grp.</u>, 879 A.2d 166, 170
(Pa. 2005).  During this interpretation, the Court examines the
contract in its entirety.  <u>Riccio v. Am. Republic Ins. Co.</u>, 705
A.2d 422, 426 (Pa. 1997).  The goal in interpreting a policy is
to "ascertain the parties' intentions as manifested by the

---

      [5]   Federal jurisdiction in this case is based on diversity
of citizenship under 28 U.S.C. § 1332.  Pursuant to <u>Erie Railroad</u>
<u>Co. v. Tompkins</u>, this Court will apply Pennsylvania substantive
law in deciding Defendant's motion for summary judgment.  304
U.S. 64 (1938).

policy's terms."  Kvaerner, 908 A.2d at 897.  To that end, "when
the language of the policy is clear and unambiguous, a court is
required to give effect to that language."  401 Fourth St., 879
A.2d at 171.  On the other hand, ambiguous policy provisions are
"construed in favor of the insured to further the contract's
prime purpose of indemnification and against the insurer, as the
insurer drafts the policy, and controls coverage."  Id.

        a.    The applicable Policy provision to the breach
              of contract claim

        Plaintiffs allege Defendant breached the policy by
refusing to release the depreciation funds.  Before reaching that
claim, there is a dispute between Plaintiffs and Defendant over
which Policy provision applies to recovery of these depreciation
funds.  Specifically, Plaintiffs seem to argue that their claim
falls under provision E(4), Loss Payment.  Defendant, on the
other hand, argues that provision G(3), entitle Replacement Cost,
governs Plaintiffs' claim for depreciation funds.[6]  The Court
finds that Plaintiffs' claims for depreciation funds must
necessarily fall under provision G(3), the Replacement Cost
provision.

_____

        [6]    Plaintiffs believe that should the Court proceed under
the Loss Payment provision, documentation of its expenditures
would be unnecessary.  In contrast, Defendant believes that the
Replacement Cost provision requires documentation of expenditures
as a predicate to claim payment.  And, because Plaintiffs have
not provided such documentation, their claims fail.

11

Provision E(4) provides for several varying methods of repayment.[7]  The only payment method possibly at issue here, "pay the value of the lost or damaged property," cross references the Valuation provision.[8]  See Pls.' Compl. Ex. A, at 13.  This provision provides that the Valuation of claims shall be on an Actual Cash Value basis.  Id. at 14.  Given that Actual Cash Value specifically excludes depreciation, Plaintiffs could not successfully recover the money they seek under the Loss Payment provision.

The Replacement Cost provision, on the other hand, allows Plaintiffs to recover such depreciation funds.  Pertinent

---

[7]     These repayment methods are:

(1)   Pay the value of lost or damaged property;
(2)   Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;
(3)   Take all or any part of the property at an agreed or appraised value; or
(4)   Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.

Pls.' Compl. Ex. A, at 13.

[8]     Plaintiffs seem to believe that Defendant is proceeding under E(4)(2), which states that Defendant "will pay the cost of repairing or replacing the lost or damaged property."  Id.  That belief is incorrect.  Under the cross-referenced Valuation provision, it is clear that Defendant will only pay this actual cost of repairing or replacing--including depreciation--if the claim is below $2,500.  See id. at 14.  Otherwise, the insured will only receive an Actual Cash Value payment.  Id.  As Plaintiffs' claims were clearly greater than $2,500, this provision is inapplicable, and Plaintiffs could only recover the Actual Cash Value under provision E(4).

12

here, this provision allows Plaintiffs to receive an Actual Cash Value payment and file a supplemental claim within 180 days to recoup depreciation.  See Id. at 17.  It is only within this supplemental claim, in this case, that Plaintiffs could recover the money they seek as such claim would be for the depreciation previously withheld from the Actual Cash Value payments. Therefore, Plaintiffs' claim must proceed under the Replacement Cost provision.  Indeed, this conclusion is buttressed by Plaintiffs' Sworn Proof of Loss Statements.  Those statements specifically provide that Plaintiffs are receiving money based upon an Actual Cash Value and to recover depreciation Plaintiffs must file supplemental claims pursuant to the Replacement Cost provision within 180 days.  See Def.'s Br. in Supp. of Mot. for Summ. J. Exs. B-D.  Accordingly, the Court will analyze Defendant's motion for summary judgment under this Replacement Cost provision.[9]

---

[9]     Specifically, this provision allows a recovery total that is the least of the following:

(1)   The Limit of Insurance applicable to the lost or damaged property;
(2)   The cost to replace the lost or damaged property with other property:
           (a)  Of comparable material and quality; and
           (b)  Used for the same purpose; or
(3)   The amount actually spent that is necessary to repair or replace the lost or damaged property.

Pls.' Compl. Ex. A., at 17.

13

b.    Summary judgment is inappropriate for
      Plaintiffs' breach of contract claim

Under the Replacement Cost provision, the center of the
parties' dispute is whether or not Plaintiffs must provide
documentation to show that they have actually spent the money
entitled to them under the Replacement Cost provision, in
accordance with subsection G(3)(e)(3).  This provision limits
recovery to "[t]he amount actually spent that is necessary to
repair or replace the lost or damaged property."[10]  Pls.' Compl.
Ex. A, at 17.  The Court finds that there is a genuine issue of
material fact as to whether Plaintiffs did actually spend such
money.

Initially, the Court finds that the term "actually
spent" is clear and unambiguous.  Nonetheless, the proof required
under the Policy to show what was actually spent is ambiguous.
In fact, there is no explicit provision requiring Plaintiffs to
provide such documentation.  Defendant states in several letters
with Plaintiffs--and in its briefing to the Court--that the
Policy requires such documentation.  See, e.g., Def.'s Br. in
Supp. of Mot. for Summ. J. 44; Def.'s Reply in Supp. of Mot. for
Summ. J. 2.  Yet, Defendant does not point to any specific Policy
language requiring receipts before making payment under the

---

[10]    Plaintiffs believe that subsection G(3) is inapplicable
to their claim.  To the extent that it is applicable, Plaintiffs
fail to argue that G(3)(e)(3) would not be the appropriate
provision.

14

Replacement Cost provision.  Nor can the Court locate any in the record.

The only possible Policy language making documentation a prerequisite to claim payment is the Policy provision requiring Plaintiffs to allow Defendant to inspect Plaintiffs' "books and records."  See Pls.' Compl. Ex. A, at 2 ("We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward."). This language does not, however, condition payment upon proof of receipts, but is a general policy requirement not explicitly directed as a prerequisite to recovery.  Ambiguity exists because should an insured not have books and records, or such records were inadvertently lost, would this clearly preclude recovery under any circumstances?  Surely not, at least not without a more explicit documentation provision.

Indeed, such an explicit condition is not uncommon in insurance contracts.  For example, in Burton v. Republic Ins. Co., 845 A.2d 889 (Pa. Super. Ct. 2004), a case that Defendant relies upon due to the similarity of the policy language, one of the explicit duties after loss in that policy was to "[p]repare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss.  Attach all bills, receipts and related documents that justify the figures in the inventory."  Id. at 897 (emphasis added).  A similar

15

provision within the Policy here states that as a duty after loss the insured shall "at our [Defendant's] request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values and amount of loss claimed."  Pls.' Compl. Ex. A, at 2.

Unlike <u>Burton</u>, the policy here does not require the attachment of documentation as one of the duties after loss. This omitted requirement under the Policy is persuasive, and the Court finds the policy is ambiguous as to the proof requirement under G(3)(e)(3).  Therefore, the matter shall proceed to trial where the parties will be left to their proofs over how much Plaintiffs "actually spent" in their replacement.[11]

For these reasons, Defendant's motion for summary judgment is denied as to Plaintiffs' contract claim.

---

[11]    Plaintiffs argue that Defendant's independent adjuster, Christopher Wixted, entered into an oral agreement on behalf of Defendant to release the depreciation funds once Plaintiffs were 80 percent completed with repairs and Mr. Wixted inspected the work.  <u>See</u> Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. 6-7; Pagano Dep. 19:21-21:3, 31:22-32:5, Feb. 17, 2011.  To the extent Plaintiffs contend this oral agreement is valid and enforceable as either a separate agreement between the parties or a contract modification, such contentions are unavailing.  This 80 percent threshold for releasing deprecation does not appear in the Policy.  And, Plaintiffs fail to provide evidence of consideration Defendant received in return for entering into the alleged oral agreement.  Moreover, the Court finds no evidence that Plaintiffs reasonably relied on Mr. Wixted's representation to their detriment.  Therefore, the alleged oral agreement between the parties is immaterial in disposing of the instant motion.

2.   Plaintiffs' Bad Faith Claim

Defendant also seeks summary judgment on Plaintiffs' allegation that Defendant exercised bad faith in denying Plaintiffs' claim under the Policy.  See 42 Pa. Cons. Stat. § 8371 (2007).  That statute provides a private right of action for bad faith.  Specifically it provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1)   Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2)   Award punitive damages against the insurer.
>
> (3)   Assess court costs and attorney fees against the insurer.

Id.  While "bad faith" is not statutorily defined, to establish a claim for bad faith denial of insurance coverage under Pennsylvania law, a plaintiff must show "with clear and convincing evidence:  (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997); see Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994).  "Clear and convincing evidence is evidence that is 'so clear, direct, weighty and convincing as to enable the [fact finder] to come to a clear conviction, without

17

hesitancy, of the truth of the precise facts in issue.'" Burrell
v. United Healthcare Ins. Co., No. 00-4697, 2001 WL 873221, at *1
(E.D. Pa. July 30, 2001) (Robreno, J.) (quoting U.S. Fire Ins.
Co. v. Royal Ins. Co., 759 F.2d 306, 309 (3d Cir. 1985)).
Therefore, in this case "in order to defeat a motion for summary
judgment, a plaintiff must show that a jury could find by 'the
stringent level of clear and convincing evidence,' that the
insurer lacked a reasonable basis for its handling of the claim
and that it recklessly disregarded its unreasonableness." 3039 B
St. Assocs., Inc. v. Lexington Ins. Co., 740 F. Supp. 2d 671, 677
(E.D. Pa. 2010) (Robreno, J.) (quoting Polselli v. Nationwide
Mut. Fire Ins. Co., 23 F.3d 747, 750 (3d Cir. 1994)); see
Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D.
Pa. 1999) ("[P]laintiff's burden in opposing a summary judgment
motion is commensurately high, because the court must view the
evidence presented in light of the substantive evidentiary burden
at trial.").

        Plaintiffs respond to Defendant's motion with three
arguments.  First, they argue that the policy provisions of the
insurance contract, on the whole, are "confusing, contradictory,
unreasonable and created in the utmost bad faith."  Pls.' Br. in
Opp'n to Def.'s Mot. for Summ. J. 9.  Second, Defendant acted
unreasonably when relying on the policy to deny their claims.
Third, they argue that Defendant withheld various claim checks

18

owed to Plaintiffs in bad faith.  The Court addresses each
argument in turn and finds that Defendant has carried the day.

a.  Defendant's alleged bad faith policy

        In essence, a statutory bad faith claim must be an
"unreasonable and intentional (or reckless) denial of benefits."
UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d 497, 506 (3d
Cir. 2004).  Thus, Plaintiffs' apparent claim that the drafting
of policy language itself was in bad faith[12] is not actionable
under Pennsylvania law.  See id. (concluding that bad faith claim
under Pennsylvania law must relate to a denial of benefits and
does not apply to singular dispute over contract terms).  To be
sure, there are a few limited areas that courts have extended
statutory bad faith beyond the denial of claims.  Yet, in each
case the bad faith claim was related to specific conduct of the
insurer following the issuance of a policy.  See, e.g., W.V.
Realty, Inc. v. Northern Ins. Co., 334 F.3d 306, 317-18 (3d Cir.
2003) (bad faith actionable for failing to follow internal
guidelines); Bonenberger v. Nationwide Mut. Ins. Co., 791 A.2d

---

        [12]  In addition to allegations that Defendant unreasonably
denied its claim payments, Plaintiffs alleged in their Complaint
that Defendant acted in bad faith by "[a]ttempting to deceive the
insureds by using a confusing and contradictory policy of
insurance."  Pls.' Compl. ¶ 26.  While the Complaint alleges the
bad faith use of this Policy, Defendant will of course use the
policy it drafted.  Accordingly, Plaintiffs' allegation is better
viewed, and its briefing in this motion confirms this view, that
Defendant's bad faith was in its drafting of the Policy.

19

378, 381 (Pa. Super. Ct. 2002) (bad faith actionable for failing to follow Nationwide's Pennsylvania Best Claims Practice Manual); O'Donnell ex rel. Mitro v. Allstate Ins., 734 A.2d 901, 906 (Pa. 1999) (bad faith may occur from litigation misconduct); Liberty Mut. Ins. Co. v. Marty's Exp., Inc., 910 F. Supp. 221 (E.D. Pa. 1996) (extending bad faith to insurer's rating and collecting of premiums in accordance with retrospective policy).  Plaintiffs point to no case--nor has the Court found any case--that holds just the drafting of a policy, or "using a confusing and contradictory policy of insurance," actionable.  The Court declines to extend statutory bad faith to territory where neither the Pennsylvania legislature nor its courts have gone before.

> b.   Defendant's alleged unreasonable denial of Plaintiffs' claim

To the extent that Plaintiffs argue that Defendant's use of the policy resulted in "an unreasonable and intentional (or reckless) denial of benefits," this also fails as a matter of law.  UPMC Health Sys., 391 F.3d at 506.  As explained above, the Court finds that the policy is ambiguous as to what proof is required under G(3)(e)(3).  Yet, ambiguity is not bad faith. Indeed, an ambiguous contract term is one that is subject to more than one reasonable interpretation.  See Burton, 845 A.2d at 893. Therefore, Defendant's interpretation here, relying upon the books and records provision to require specific documentation,

although unpersuasive to the Court, was reasonable and cannot be the basis for a claim of bad faith.  See Toll Naval Assocs. v. Lexington Ins. Co., No. 03-6537, 2005 WL 1923836, at *4 (E.D. Pa. Aug. 10, 2005).  Hence, no jury could conclude, by clear and convincing evidence, that Defendant acted unreasonably in denying Plaintiffs' claim.[13]

       c.    Defendant's alleged bad faith from withholding payment

Defendant argues that summary judgment is also appropriate because Defendant's alleged delaying of claim payment was not in bad faith.  In response to Defendant's motion for summary judgment, Plaintiffs present documentary evidence that one claim check issued by Defendant was allegedly delayed over two months.  Plaintiffs also provide testimony that Defendant had delayed payments on several other occasions in the settlement of Plaintiffs' claim.  Both arguments are unavailing.

As to the claim payment specifically referred to with documentary evidence by Plaintiffs, the Court finds that such

---

[13]    Moreover, even assuming that Defendant unreasonably withheld claims due to its confusing and contradictory policy, there is no record evidence that Defendant acted with the required state of mind.  See Klinger, 115 F.3d at 233 (recognizing plaintiffs must show to succeed in bad faith claim "[t]hat the insurer knew or recklessly disregarded its lack of reasonable basis.").  Accordingly, a reasonable jury could not conclude, by clear and convincing evidence, that Defendant acted in bad faith in writing and applying its policy to Plaintiffs' insurance claim.

21

delay, if any, was reasonable.  Plaintiffs provide that Defendant issued a payment check under the claims at issue here dated on February 16, 2009, but was not tendered to Plaintiffs until on or about April 15, 2009.  Pls.' Compl. Ex. B.  Plaintiffs argue that this delay of approximately two months illustrates Defendant's bad faith.  Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. 12-13.  Nonetheless, the policy states that loss payments will issue within thirty days from the time Defendant receives a Sworn Proof of Loss.  Pls.'s Compl. Ex. A, at 13.  The parties do not dispute that the Sworn Proof of Loss with respect to this check was signed and notarized on March 17, 2009.  Therefore, by the Court's calculation, the check was tendered within the thirty days provided in the Policy.  Defendant provides no explanation as to why the check issued in February.  Nonetheless, Plaintiffs point to no evidence that such delay was unreasonable.  Without such evidence, by complying with the terms of the policy, Defendant has acted reasonably.  <u>Cf.</u>  <u>London v. Ins. Placement Facility of Pa.</u>, 703 A.2d 45, 50 (Pa. Super. Ct. 1997) (holding that defendants complied with terms of policy and therefore rejecting plaintiffs' claim of bad faith).

Plaintiffs also support their claim of bad faith by providing testimonial evidence that the nonpayment of claims occurred multiple times in this case.  Pegano Dep. 51:3-5, Feb. 17, 2011.  This evidence is insufficient to defeat Defendant's

motion for summary judgment.  Plaintiffs submitted the deposition testimony of Plaintiffs' public claims adjuster George Pagano. Within his testimony, Mr. Pagano states that Defendant repeatedly delayed sending checks to Plaintiffs and that Plaintiffs had to "beg for the money."  Pegano Dep. 47:24, Feb. 17, 2011.  What Plaintiffs do not provide, however, is evidence that Plaintiffs were entitled to such money when requested.

Indeed, Defendant's exhibits show that in regards to the claims under the Policy, Plaintiffs submitted three Sworn Proof of Loss statements.  <u>See</u> Def.'s Br. in Supp. of Mot. for Summ. J. Exs. B-D.  In accordance with the Policy, Defendant has thirty days to pay Plaintiffs' claims.  <u>See</u> Pls.' Compl. Ex. A, at 13.  While Mr. Pagano complained that many payments were delayed, he does not identify any specific payment that failed to comply with the Policy terms.  Thus, on this record, no reasonable jury could conclude, by clear and convincing evidence, that any delay of payments was unreasonable.

What is more, assuming, <u>arguendo</u>, that Defendant did delay the payment of claims, courts in Pennsylvania have declined to draw a bright line for finding unreasonableness because of delays in settling or from investigating claims.  Indeed, under certain circumstances, delays of up to forty-two months are insufficient to show bad faith.  <u>See, e.g.</u>, <u>Thomer v. Allstate Ins. Co.</u>, --- F. Supp. 2d ----, No. 10-375, 2011 WL 1755240, *10

(E.D. Pa. May, 9, 2011); <u>Williams v. Hartford Cas. Ins. Co.</u>, 83 F. Supp. 2d 567, 572 (E.D. Pa. 2000); <u>Quaciari v. Allstate Ins. Co.</u>, 998 F Supp. 578, 582-83 (E.D. Pa. 1998); <u>see also</u> <u>Morrisville Pharm., Inc. v. Hartford Cas. Ins. Co.</u>, No. 09-2868, 2010 WL 4323202, at *5 n.40 (E.D. Pa. Oct. 29, 2010) (describing cases holding that "spans of thirteen to fifteen months to process claims are reasonable"). Without more evidence from Plaintiffs, no reasonably jury could conclude, by clear and convincing evidence, that a delay of at worst two months was unreasonable.

And, even assuming further that such delay was unreasonable, there is no record evidence to indicate what this delay was for and, therefore, no evidence as to why Defendant did delay submission of payments to Plaintiffs. Thus, there is no evidence this delay was knowing or reckless. <u>See</u> <u>3039 B Street Assocs.</u>, 740 F. Supp. 2d at 677 ("[M]ere negligence or bad judgment is not bad faith.") (quoting <u>Polselli</u>, 23 F.3d at 751).

In sum, looking at all of Defendant's actions in total, Plaintiffs fail to point to any evidence from which a jury could clearly and convincingly find that Defendant "lacked a reasonable basis for denying benefits" and "knew or recklessly disregarded its lack of a reasonable basis," <u>Klinger</u>, 115 F.3d at 233. Accordingly, the Court will grant Defendant's motion as to Plaintiffs' bad faith claim, Count III.

C.    Remote to State Court

C.    Remand to State Court

Because the Court will grant Defendant's motion for
summary judgment on Plaintiffs' bad faith claim, the amount in
controversy falls below the $75,000 threshold under 28 U.S.C. §
1332(a) for diversity jurisdiction.  While the Court need not
remand this action to state court, it has discretion to remand.
See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to
exercise supplemental jurisdiction over a claim under subsection
(a) if . . . the district court has dismissed all claims over
which it has original jurisdiction."); 14AA Charles Alan Wright,
et al., Federal Practice & Procedure § 3702.4 (4th ed. 2009)
("[E]ven if part of the plaintiff's claim is dismissed, for
example, on a motion for summary judgment, thereby reducing the
plaintiff's remaining claim below the requisite amount in
controversy, the district court retains jurisdiction to
adjudicate the balance of the claim.").  Indeed, "where the claim
over which the district court has original jurisdiction is
dismissed before trial, the district court must decline to decide
the pendent state claims unless considerations of judicial
economy, convenience, and fairness to the parties provide an
affirmative justification for doing so."  Borough of West Mifflin
v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995).  Here, the Court
has worked extensively with the parties disposing of several
issues and preparing the case for trial.  The Court and the

parties are ready, willing, and able to proceed to trial.  In the interests of judicial economy and comity, the Court, in the exercise of its discretion, declines to remand the case.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment of Count I will be denied, and its motion for summary judgment of Count III will be granted.  An appropriate Order will follow.